## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WELLS FARGO BANK, N.A., as trustee for the benefit of the Registered Holders of JPMBB Commercial Mortgage Securities Trust 2015-C31, Commercial Mortgage Pass-Through Certificates Series 2015-C31,<br><br>        Plaintiff,<br><br>v.<br><br>MICHAEL SILBERBERG,<br><br>        Defendant. | Case No.<br><br>District Judge:<br><br>Magistrate Judge: |

## COMPLAINT

Plaintiff, WELLS FARGO BANK, N.A., as trustee for the benefit of the Registered

Holders of JPMBB Commercial Mortgage Securities Trust 2015-C31, Commercial Mortgage

Pass-Through Certificates Series 2015-C31 ("Plaintiff"), for itself and on behalf of

WILMINGTON TRUST, N.A., as trustee for the benefit of the Registered Holders of JPMBB

Commercial Mortgage Securities Trust 2015-C32, Commercial Mortgage Pass-Through

Certificates Series 2015-C32 ("A-2 Lender," or, collectively with Plaintiff, "Lender"), acting by

and through special servicer, Rialto Capital Advisors, LLC ("Special Servicer"), by its

undersigned counsel, complains of MICHAEL SILBERBERG, an individual ("Defendant" or

"Guarantor") and seeks to enforce that certain Guaranty Agreement, dated July 8, 2015 (the

"Guaranty") and other relief, and in support thereof states as follows:

## Nature of Action

1.      By this complaint, Plaintiff seeks to enforce the Guaranty made by Guarantor.

Guarantor irrevocably and unconditionally guaranteed certain obligations of SL Civic Wacker

LLC, a Delaware limited liability company ("Borrower") who received the Loan (as defined

below) from JPMorgan Chase Bank, N.A. ("JPMorgan"), as predecessor to Plaintiff, pursuant to a July 8, 2015 loan agreement (the "Loan Agreement," or, with all other related documents, the "Loan Documents").  Borrower has failed to pay the obligations due and owing with respect to the Loan and Lender is now seeking a monetary judgment against Guarantor.

2.      Guarantor has failed to pay amounts due and owing.  Plaintiff is seeking an amount equal to full repayment of the Debt plus damages, costs, and fees.  The Loan is "full recourse," meaning that Borrower, and therefore Guarantor, is liable for the full amount of the Debt rather than having its liability capped at the value of the property securing the Loan.  The Loan became full recourse in this case because of the occurrence of certain triggering events, described below, including Borrower borrowing millions of dollars from another party without Lender's consent or permission, putting the creditworthiness of Borrower at stake.

3.      Plaintiff is not required to pursue any remedy against Borrower or any other person or entity before bringing this action.  Plaintiff previously initiated a mortgage foreclosure action against Borrower in the Circuit Court of Cook County, Illinois, Case Number 2021-CH-03945 (the "Foreclosure Action").  The Foreclosure Action is currently pending.  While Borrower has not disputed the failure to pay, it is contesting the Foreclosure Action.  Guarantor is not a party to that action.  As is permitted, Plaintiff is pursuing this action simultaneously.

4.      Accordingly, Plaintiff seeks judgment against Guarantor in the aggregate principal amount calculated as of March 6, 2023, of $205,090,246.92 plus all applicable interest, fees (including reasonable attorneys' fees), and costs owed under the Loan Documents (as defined below), and all amounts accruing in the future.

## Parties

5.      Plaintiff is a national banking association located in South Dakota, with its principal place of business at 101 North Phillips Avenue, Sioux Falls, South Dakota 57104.

Pursuant to 28 U.S.C. § 1348, Plaintiff is a citizen of the State of South Dakota for purposes of establishing diversity jurisdiction in accordance with 28 U.S.C. § 1332.

6.      Plaintiff, as trustee for the benefit of the Registered Holders of JPMBB Commercial Mortgage Securities Trust 2015-C31, Commercial Mortgage Pass-Through Certificates Series 2015-C31, and as the assignee of the A-2 Lender's rights as trustee for the benefit of the Registered Holders of JPMBB Commercial Mortgage Securities Trust 2015-C32, Commercial Mortgage Pass-Through Certificates Series 2015-C32, is the real and substantial party to the controversy.

7.      Guarantor was one of the principals involved in the negotiations and efforts to obtain the Loan on behalf of Borrower, and Lender required that Guarantor execute the Guaranty as a condition of the Loan.

8.      On information and belief, Guarantor is an adult resident of the State of New York currently residing at 29 Lyncrest Drive, Monsey, New York 10952-1631.  Guarantor has also stated in the Guaranty that he has an address at 55 Old Nyack Turnpike, Suite 210, Nanuet, New York 10954.  Guarantor is a citizen of the State of New York for purposes of establishing diversity jurisdiction pursuant to 28 U.S.C. § 1332.

## Jurisdiction and Venue

9.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $100 million, exclusive of interest and costs.

10.     The negotiations for the Loan Agreement occurred in the State of New York.

11.     The Loan was made in the State of New York.

12.     The Loan Agreement and Guaranty are governed and construed by the laws of the State of New York.

13.     The Loan was accepted by Borrower in the State of New York.

14.     The proceeds of the Loan were disbursed from the State of New York.

15.     The parties to the Loan Agreement agreed in Section 10.3 of the Loan Agreement that the State of New York "has a substantial relationship to the parties and to the underlying transaction embodied [in the Loan documents]."  **Exhibit A**, at 98.

16.     Guarantor designated and appointed counsel in the State of New York as his authorized agent to accept and acknowledge any service of process in any proceedings involving the Guaranty.

17.     This Court has personal jurisdiction over Guarantor because Guarantor is domiciled in New York State and, in Section 5.3 of the Guaranty, Guarantor consented to and waived any objection to personal jurisdiction, by agreeing that "any legal proceeding against Lender or Guarantor arising out of or relating to this guaranty may at Lender's option be instituted in any federal or state court in the City of New York, County of New York, pursuant to pursuant to section 5-1402 of the New York General Obligations Law, and Guarantor hereby irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding."

18.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District and because, in Section 5.3 of the Guaranty, Guarantor "waive[d] any objections . . . based on venue and/or forum non conveniens of any such suit, action or proceeding" "instituted in a federal or state court in the City of New York, County of New York."

### Facts

19.     This breach of contract action arises out of Guarantor's default of its guaranty obligations related to a commercial real estate loan in the original principal amount of $164 million.

20.     This matter involves a significant loan that would not have happened if Guarantor had not agreed to provide the additional security set forth in the Guaranty.

21.     The business deal was clear, but, like many large commercial real estate deals, it carried some degree of risk for Borrower and Guarantor.

22.     The core allegations are simple.

23.     Borrower borrowed money, Borrower defaulted on the Loan, and Lender accelerated the Loan.

24.     The Loan is full recourse against both Borrower and Guarantor due to the occurrence of certain triggering events.

25.     Borrower has failed to pay amounts due and owing, Lender demanded that Guarantor pay those same amount, and Guarantor failed to pay the amounts due and owing.

26.     Although there is a Foreclosure Action pending, Plaintiff is entitled to pursue separately and simultaneously Guarantor for the full outstanding amount of the Loan plus other damages.

27.     Guarantor's failure to pay amounts due has caused damages in excess of $200 million, in an amount to be proven at trial.

*The Loan Documents*

28.     On or about July 8, 2015, Borrower entered into the Loan Agreement with JPMorgan, Plaintiff's predecessor-in-interest, whereby JPMorgan agreed to and did in fact advance to Borrower a $164,000,000 loan (the "Loan") to be secured by a parcel of real property with an address of 10, 20, and 30 North Wacker Drive, Chicago, Illinois, at times described collectively as 20 North Wacker Drive, Chicago, Illinois (the "Property"), pursuant to a Mortgage, Assignment of Leases and Rents and Security Agreement (the "Mortgage"), executed

the same day.  A copy of the Loan Agreement is attached hereto as **Exhibit A** and a copy of the Mortgage is attached hereto as **Exhibit B**.

29.     The Property is a 45-story office tower adjacent to Chicago's historic Civic Opera House and commonly known as the Civic Opera Building.

30.     As security for the Loan, Guarantor executed the Guaranty, also dated July 8, 2015, in favor of JPMorgan.  A copy of the Guaranty is attached hereto as **Exhibit C**.  Plaintiff currently holds the Guaranty.

31.     Borrower's indebtedness under the Loan Agreement is evidenced by an Amended and Restated Promissory Note, dated July 31, 2015 (the "A-1 Note"), in the original principal amount of $89,000,000 (the "A-1 Loan") and an Amended and Restated Promissory Note, dated July 31, 2015 (the "A-2 Note," or, with the A-1 Note, the "Note"), in the original principal amount of $75,000,000 (the "A-2 Loan").  A copy of the A-1 Note is attached hereto as **Exhibit D** and a copy of the A-2 Note is attached hereto as **Exhibit E**.

32.     Pursuant to a Pooling and Servicing Agreement dated August 1, 2015, Plaintiff was designated as Trustee of JPMBB Commercial Mortgage Securities Trust 2015-C31 Commercial Mortgage Pass Through Certificates, Series 2015-C31 (the "A-1 PSA"), the trust in which the A-1 Loan was deposited.  A copy of the A-1 PSA is attached hereto as **Exhibit F**.

33.     Under Section 2.01 of the A-1 PSA, "all the right, title and interest" in the A-1 Loan was assigned to Plaintiff as trustee.  **Exhibit F**, at 112.

34.     Pursuant to a Pooling and Servicing Agreement dated October 1, 2015, the A-2 Lender was designated as Trustee of JPMBB Commercial Mortgage Securities Trust 2015-C32 Commercial Mortgage Pass Through Certificates, Series 2015-C32 (the "A-2 PSA"), the trust in which the A-2 Loan was deposited.  A copy of the A-2 PSA is attached hereto as **Exhibit G**.

35.     Under Section 2.01 of the A-2 PSA, "all the right, title and interest" in the A-2 Loan was assigned to A-2 Lender as trustee.  **Exhibit G**, at 113-14.

36.     Pursuant to an allonge dated August 24, 2015, the right to payment pursuant to the A-1 Note was assigned to Plaintiff (the "A-1 Allonge").  Pursuant to an allonge dated October 22, 2015, the right to payment pursuant to the A-2 Note was assigned to the A-2 Lender (the "A-2 Allonge").  A copy of the A-1 Allonge is attached hereto as **Exhibit H**.  A copy of the A-2 Allonge is attached hereto as **Exhibit I**.

37.     On or about August 24, 2015, JPMorgan executed a General Assignment (the "General Assignment") pursuant to which it assigned its right, title, and interest in the Loan and all related agreements, including the Guaranty, to Plaintiff.  A copy of the General Assignment is attached hereto as **Exhibit J**.

38.     On or about August 28, 2015, JPMorgan executed an Assignment of Mortgage, Assignment of Leases and Rents and Security Agreement (the "Mortgage Assignment") pursuant to which it assigned its right, title, and interest in the Mortgage to Plaintiff.  A copy of the Mortgage Assignment is attached hereto as **Exhibit K**.

39.     On or about August 28, 2015, Plaintiff and the A-2 Lender executed a Co-Lender Agreement (the "Co-Lender Agreement"), pursuant to which the A-2 Lender granted Plaintiff the sole and exclusive right to pursue any remedy concerning the Loan (*see* Co-Lender Agreement, at 21-22), which includes the right to enforce the Guaranty.  A copy of the Co-Lender Agreement is attached hereto as **Exhibit L**.

### *The Guaranty and Guaranty Obligations*

40.     Under Section 1.1 of the Guaranty, "Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations."  **Exhibit C**, at 1.

41.     Section 1.2 of the Guaranty defines the Guaranteed Obligations as "all obligations and liabilities of Borrower pursuant to Section 9.3 of the Loan Agreement."  **Exhibit C**, at 2.

42.     Section 9.3 of the Loan Agreement is a multi-page provision that provides that Lender may seek full money damages and a deficiency judgment against Borrower, and therefore against Guarantor, if either of two sets of circumstances occur.

43.     Under the first set of circumstances in Section 9.3, found on page 95 and 96 of the Loan Agreement, Lender may pursue monetary damages for "actual loss, actual damage, cost, expense, liability, claim or other obligation incurred by Lender . . . arising out of or in connection with" certain defined wrongful acts that sit outside the general obligation to make payments under the terms of the Loan.  *See* **Exhibit A**, at 95.  These acts include, *inter alia*, fraud, misrepresentation, willful misconduct, intentional material physical waste, failure to pay charges for labor or materials, failure to maintain its status as a Special Purpose Entity, and failure to comply with any representations, warranties, or covenant in Section 4.1.30.

44.     Among the acts included, in Section 9.3(g)(vi), is the "failure to pay charges for labor or materials or other charges or judgments that can create Liens on any portion of the Property [("Mechanic's Liens")] . . . provided, however, Borrower shall have no liability under this subsection (vi)" in two defined circumstances: first, if "sufficient cash flow in not available to Borrower from the Property unless Borrower incurred such charges after the occurrence and during the continuance of an Event of Default," or unless "such insufficient cash flow arises

from the intentional misappropriation or conversion of revenues with respect to the Property," or, second, if "failure to pay such charges is due solely to the failure of Lender or Servicer to release or apply amounts in the Reserve Funds escrowed for such purposes." **Exhibit A**, at 95-96.

45.     Under the second set of circumstances in Section 9.3, found below the first set of circumstances on page 96 and on page 97 of the Loan Agreement, "the Debt shall be fully recourse to Borrower" if, *inter alia*, "Borrower fails to maintain its status as a Special Purpose Entity," except to the extent that failure is a result of noncompliance with a clause and in a circumstance inapplicable to this action or "Borrower fails to obtain Lender's prior written consent to any Indebtedness not otherwise permitted hereunder or under any other Loan Document or voluntary Lien encumbering the Property which does not constitute a Permitted Encumbrance." **Exhibit A**, at 97, *see* (iii) and (iv).

46.     The Loan Agreement defines Indebtedness to include, *inter alia*, "all indebtedness or liability of [a] Person." **Exhibit A**, at 9.

47.     These provisions were critical to Lender's agreement to make the Loan because Lender planned to securitize the resultant debt, and Lender needed to ensure that the Borrower's creditworthiness would not be downgraded after Lender dispersed the Loan.

48.     As set forth in more detail below, Borrower incurred unauthorized Indebtedness and failed to remain a "Special Purpose Entity" as defined in the Loan Agreement.

49.     Borrower's unauthorized Indebtedness violated each of the two sets of circumstances in Section 9.3: subsection (viii) on page 96 (failure to abide by the definition of Special Purpose Entity, which prohibits, among other things, unauthorized Indebtedness), and romanettes (iii) and (iv) on page 97 (failure to maintain status as a Special Purpose Entity and failure to obtain Lender's prior written consent to any Indebtedness, respectively).

50.     Most notably here, the violation of the provisions in romanettes (iii) and (iv), on page 97, automatically makes the Debt fully recourse and allows Lender to pursue repayment of the entire amount of the Debt through a claim for money damages.  In addition, due to the violation of subsection (viii) on page 96, Lender may pursue a claim for actual damages, fees, costs, and certain other items arising from Borrower's violation of the Special Purpose Entity obligations.

*Additional Relevant Provisions of the Loan Agreement*

51.     The Loan Agreement defines Debt as "the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid hereon and all other sums . . . due to Lender in respect of the Loan under the Note, this Agreement, the Mortgage or any other Loan Document."  **Exhibit A**, at 4.

52.     Under the Loan Agreement, the Default Rate of interest is "the lesser of (a) the Maximum Legal Rate or (b) four percent (4%) above the Interest Rate."  **Exhibit A**, at 5.  The Interest Rate is "(a) with respect to the initial Accrual Period, a rate of four and 722/1000 percent (4.722%) per annum and (b) thereafter, a rate of four and 672/1000 percent (4.672%) per annum."  **Exhibit A**, at 11.  "[T]he initial Accrual Period shall commence on and include the Closing Date and shall end on and include the final calendar date of the calendar month in which the Closing Date occurs."  **Exhibit A**, at 1.

53.     The definition of "Special Purpose Entity" is very detailed and spans approximately six pages in the Loan Agreement.

54.     Failure to comply with the definition of Special Purpose Entity in the Loan Agreement is an Event of Default pursuant to Section 8.1(a)(xvi) of the Loan Agreement.

55.     Multiple subsections of the definition of Special Purpose Entity require that the entity "has not incurred Indebtedness," except as specifically permitted therein.  **Exhibit A**, at 23, 26-27.

56.     The Loan Agreement defines Indebtedness as:

> [T]he sum (without duplication) . . . of (a) all indebtedness or liability . . . (including, without limitation, amounts for borrowed money and indebtedness in the form of mezzanine debt or preferred equity); (b) obligations evidenced by bonds, debentures, notes, or other similar instruments; (c) obligations for the deferred purchase price of property or services (including trade obligations); (d) obligations under letters of credit; (e) obligations under acceptance facilities; (f) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds, to invest in any Person or entity, or otherwise to assure a creditor against loss; and (g) obligations secured by any Liens, whether or not the obligations have been assumed (other than the Permitted Encumbrances).

**Exhibit A**, at 9-10.

### *Additional Relevant Provisions of the Guaranty*

57.     Section 1.3 of the Guaranty, entitled "Nature of Guaranty," is clear that the Guaranty is an absolute and irrevocable guaranty of payment and performance:

> This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection.  This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after (if Guarantor is a natural person) Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs.  The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations.  This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

**Exhibit C**, at 2.

58.     Pursuant to Section 1.4 of the Guaranty, Guarantor also agreed that any amounts collected from Borrower **would not** act as an offset against or limitation on Guarantor's liability or obligations under the Guaranty:

> The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder, shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower, or any other party, against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

**Exhibit C**, at 2.

59.     Additionally, Section 1.5 of the Guaranty, entitled "Payment by Guarantor," states that Guarantor must make a payment "immediately" upon Lender's demand:

> If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, immediately upon demand by Lender, and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity, or any other notice whatsoever, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein.

**Exhibit C**, at 2.

60.     Moreover, pursuant to Section 1.6 of the Guaranty, "No Duty to Pursue Others," Lender is not required to "institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other person;" "enforce Lender's rights against any collateral which shall ever have been given to secure the Loan;" "join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty;" "exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan;" or "resort to any other means of obtaining payment of the Guaranteed Obligations" before bringing suit to enforce the Guaranty.  **Exhibit C**, at 2.

61.     Under Section 1.8 of the Guaranty, entitled "Payment of Expenses,"

> In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, immediately upon demand by Lender pay Lender all costs and reasonable expenses (including court costs and reasonable attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder.

**Exhibit C**, at 3.

<em>Borrower's Defaults</em>

62.     Plaintiff sent notice of three previous defaults on November 17, 2020; January 26, 2021; and March 19, 2021.

63.     Plaintiff copied Guarantor on each notice.

64.     Borrower failed to tender the Monthly Payment Amount due on May 1, 2021.

65.     This failure to pay constituted an Event of Default under the Loan Documents.

66.     Prior to this Event of Default, the Property had incurred $1,566,571.02 in Mechanic's Liens, which have never been discharged.  At the time these Mechanic's Liens were imposed, Borrower had sufficient cash flow from the Property to pay the debts from which the Mechanic's Liens resulted, and Borrower's failure to pay the debts did not result from Lender or Servicer's refusal to release or apply amounts in the Reserve Funds escrowed for that purpose.

67.     The Loan Agreement allowed Plaintiff to accelerate the entire value of the Loan due to the Event of Default: "Upon the occurrence of an Event of Default . . . and at any time thereafter . . . Lender may . . . declar[e] the Debt to be immediately due and payable[.]"  **Exhibit A**, at 90-91.

68.     Counsel for the Special Servicer issued to Borrower a Notice of Default and Acceleration of Debt on June 23, 2021 (the "June 23, 2021 Notice").  In the June 23, 2021

Notice, Plaintiff accelerated the Loan, and demanded that Borrower immediately pay the then-due principal amount of $157,291,663.37, plus interest accrued thereafter.

69.      Guarantor was copied on the June 23, 2021 Notice.

70.      The June 23, 2021 Notice also advised Borrower that it would be responsible for Plaintiff's cost of collection, including attorneys' fees.  A copy of the June 23, 2021 Notice is attached hereto as **Exhibit M**.

71.      The demanded amounts remain unpaid.

72.      The Event of Default noticed in the June 23, 2021 Notice remains in effect.

73.      On October 11, 2021, Counsel for the Special Servicer issued to Borrower a Notice of Events of Default - Mechanics Lien (the "October 11, 2021 Notice").  In the October 11, 2021 Notice, Plaintiff gave notice that Borrower had committed an Event of Default by allowing the filing of two mechanics liens against the Property.  A copy of the October 11, 2021 Notice is attached hereto as **Exhibit N**.

74.      The October 11, 2021 Notice also advised, "that pursuant to Section 9.3(vi) of the Loan Agreement, Lender[s] may also pursue Borrower and Guarantor directly and personally under Borrower's Recourse Obligations." *See* **Exhibit N**, at 3.

75.      Guarantor was copied on the October 11, 2021 Notice.

76.      The Event of Default noticed in the October 11, 2021 Notice remains in effect.

*The Foreclosure*

77.      On August 21, 2021, Lender commenced the Foreclosure Action against Borrower.

78.      Guarantor is not a party to the Foreclosure Action.

79.      That action remains pending in the Circuit Court of Cook County, Illinois.

*Recourse Triggering Event*

80.     After commencing the Foreclosure Action, Lender engaged a financial investigator to investigate Borrower's financial operations.

81.     The investigator uncovered certain financial issues.

82.     As of 2019 and 2020, Borrower had obtained loans from one or more affiliate entities ("Affiliate Loans").

83.     According to Borrower's own financial statements, "[a]s of December 31, 2020 and 2019, an affiliated entity advanced funds to [Borrower] totaling $12,154,801 and $7,529,080, respectively, which bear interest at 10% *per annum* and are due on demand" (emphasis in original).

84.     The Affiliate Loans are an Indebtedness as defined in the Loan Agreement.

85.     The Affiliate Loans are an Indebtedness "not otherwise permitted" under Section 9.3 of the Loan Agreement "or under any other Loan Document or voluntary Lien encumbering the Property."

86.     The Affiliate Loans "do[] not constitute a Permitted Encumbrance."

87.     Lender did not provide prior consent, written or otherwise, for the Affiliate Loans.

88.     Borrower has failed to maintain its status as a Special Purpose Entity and failed to do so for a reason other than insufficient cash flow from the Property.

89.     As a result of these events, and the fact that Plaintiff, on behalf of itself and A-2 Lender, previously accelerated the Debt, the Guaranteed Obligation, for which Guarantor is personally liable, is the entire value of the entire "outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid hereon and all other sums."

15

90.     Additionally, after the initial Event of Default was noticed on June 23, 2021, the Property incurred an additional $512,701.01 in Mechanic's Liens.

*Guaranty Demand and Ongoing Failure to Pay*

91.     Counsel for the Special Servicer on behalf of Lender issued a notice and demand dated March 31, 2023 (the "March 31, 2023 Notice").  The March 31, 2023 Notice gave formal notice of the recourse-triggering event, gave notice of default, and demanded that Guarantor immediately satisfy the Guarantor's Guarantee Obligations in the form of paying the full indebtedness due under the Loan Documents (the "Full Indebtedness") and the total amounts of the Mechanic's Liens.  A copy of the March 31, 2023 Notice is attached hereto as **Exhibit O**.

92.     The Full Indebtedness includes, but is not limited to, special servicing fees, liquidation fees, property protective advances, interest on advances, yield maintenance, tax and insurance advances, expenses for any inspection of the Property, appraisal fees, fees and costs incurred with respect to title, U.C.C. and litigation/judgment searches, and the reasonable fees of professionals, including attorneys, engaged by Lender or Special Servicer with respect to the foregoing.

93.     Guarantor has not complied with the demand in the March 31, 2023 Notice.

94.     As of March 6, 2023, as demanded in the March 31, 2023 Notice, the Full Indebtedness equaled $203,010,974.89 and the amount of the Mechanic's Liens equaled $2,079,272.03.  Thus, the amount demanded was $205,090,246.92.

95.     The amounts due and owing continue to accrue and include future and ongoing interest, costs, fees, and other ongoing expenses.

**<u>FIRST COUNT</u>**
**(Breach of Contract/Failure to Pay Amounts Due Under Loan)**

96.     Plaintiff re-alleges and incorporates by reference as if set forth in full herein the

allegations contained in paragraphs 1 through 95 above.

97.     On or about July 8, 2015, Guarantor signed the Guaranty in favor of JPMorgan

wherein he contractually promised that he would guarantee the payment and performance of the

Guaranteed Obligation as defined by the Guaranty and Loan Agreement.

98.     Through the A-1 Allonge, General Assignment, and Mortgage Assignment,

JPMorgan assigned to Plaintiff all of its rights under the Loan Documents.  Through the Co-

Lender Agreement, A-2 Lender granted Plaintiff the sole and exclusive right to pursue any

remedy concerning the Loan, including enforcement of the Guaranty.

99.     The Guaranty is a valid and enforceable contract between Guarantor and Plaintiff.

100.    Plaintiff has fully performed its obligations under the Guaranty.

101.    The Debt is full recourse under Section 9.3 of the Loan Agreement and a

Guaranteed Obligation pursuant to Section 1.2 of the Guaranty as a result of Borrower's

impermissible Indebtedness and impermissible failure to maintain its status as a Special Purpose

Entity.

102.    Borrower has not paid the Debt, which is due and owing.

103.    Pursuant to Section 1.5 of the Guaranty, Guarantor is liable upon demand because

Borrower has not paid a Guaranteed Obligation punctually when due.

104.    On March 31, 2023, Plaintiff demanded that Guarantor immediately pay all

amount due and owing under the Guaranty.

105.    Guarantor has failed and refused, and continues to fail and refuse, to honor his obligations to Plaintiff under the Guaranty, including his obligation to pay the full amount due and owing under the Loan Documents.

106.    As of the date hereof, Guarantor is liable to Plaintiff under the Guaranty for the maximum amount due and owing under the Loan Documents, together with interest accrued thereunder, and the fees, costs, and expenses incurred by Plaintiff in protecting its rights and pursuing its remedies against Guarantor and Borrower.

## SECOND COUNT
**(Breach of Contract/Failure to Pay Damages/Special Purpose Entity)**

107.    Plaintiff re-alleges and incorporates by reference as if set forth in full herein the allegations contained in paragraphs 1 through 106 above.

108.    The Loan Agreement specifies that Guarantor will be liable for:

> any actual loss, actual damage, cost, expense, liability, claim or other obligation incurred by Lender (including attoneys' fees and expenses reasonably incurred, but in all events excluding any consequential, punitive, special and exemplary damages . . . ) arising out of or in connection with . . . if Borrower fails to maintain its status as a Special Purpose Entity . . . except to the extent that noncompliance with [this] clause . . . is caused by insufficient cash flow from the Property.

**Exhibit A**, at 95-96.

109.    Borrower has failed to maintain its status as a Special Purpose Entity.  It failed for a reason other than insufficient cash flow from the Property.  This is an Event of Default pursuant to Section 8.1(a)(xvi) of the Loan Agreement because Borrower has incurred and holds Indebtedness that does not fall into permitted categories.

110.    Plaintiff has suffered actual losses and actual damage as a result of Borrower's failure to maintain its status as a Special Purpose Entity.

111.    On March 31, 2023, Plaintiff sent notice to Borrower and Guarantor that Borrower no longer qualified as a Special Purport Entity for a reason other than insufficient cash flow from the Property under the Loan Agreement, and demanded that Guarantor immediately pay all amount due and owing under the Guaranty.

112.    Guarantor has failed and refused, and continues to fail and refuse, to honor his obligations to Plaintiff under the Guaranty, including his obligation to pay for actual losses and actual damages resulting from Borrower's failure to maintain its status as a Special Purpose Entity.

113.    As of the date hereof, Guarantor is liable to Plaintiff under the Guaranty for the maximum amount due and owing under the Loan Documents, together with interest accrued thereunder, and the fees, costs, and expenses incurred by Plaintiff in protecting its rights and pursuing its remedies against Guarantor and Borrower.

## THIRD COUNT
### (Breach of Contract/Failure to Pay Damages/Mechanic's Liens)

114.    Plaintiff re-alleges and incorporates by reference as if set forth in full herein the allegations contained in paragraphs 1 through 113 above.

115.    The Loan Agreement specifies that Guarantor will be liable for:

> any actual loss, actual damage, cost, expense, liability, claim or other obligation incurred by Lender (including attoneys' fees and expenses reasonably incurred, but in all events excluding any consequential, punitive, special and exemplary damages . . . ) arising out of or in connection with . . . failure to pay charges for labor or materials or other charges or judgments that can create Liens on any portion of the Property . . . provided, however, Borrower shall have no liability under this subsection if (x) sufficient cash flow is not available to Borrower from the Property unless Borrower incurred such charges after the occurrence and during the continuance of an Event of Default or if such insufficient cash flow arises from the intentional misappropriation or conversion of revenues with respect to the Property or (y) failure to pay such charges is due solely to the failure of Lender or Servicer to release or apply amounts in the

Reserve Funds escrowed for such purposes pursuant to the express terms of this Agreement[.]

**Exhibit A**, at 95-96.

116.    Before the Event of Default noticed on June 23, 2021, Borrower failed to pay charges for labor or materials or incurred other charges or judgments that could and did create Liens on a portion of the Property.  At the time of these failures, Borrower had sufficient cash flow from the Property to pay the amounts due, and, to the extent that Borrower did not have sufficient cash flow, that insufficient cash flow arose from Borrower's intentional misappropriation or conversion of revenues with respect to the Property.  Additionally, Borrower's failure to pay the amounts due did not result from Lender or Servicer's refusal to release or apply amounts in the Reserve Funds escrowed for that purpose.

117.    These pre-Event of Default charges equal $1,566,571.02.

118.    After the Event of Default noticed on June 23, 2021, Borrower failed to pay charges for labor or materials or incurred other charges or judgments that could and did create Liens on a portion of the Property.

119.    These post-Event of Default charges equal $512,701.01.

120.    Plaintiff has suffered actual losses and actual damage as a result of Borrower's failure to pay charges for labor or materials or incurred other charges or judgments that could and did create Liens on a portion of the Property.

121.    On March 31, 2023, Plaintiff sent notice to Borrower and Guarantor of Borrower's failure to pay charges for labor or materials or incurred other charges or judgments that could and did create Liens on a portion of the Property, and demanded that Guarantor immediately pay all amount due and owing under the Guaranty.

122.     Guarantor has failed and refused, and continues to fail and refuse, to honor his obligations to Plaintiff under the Guaranty, including his obligation to pay for actual losses and actual damages resulting from Borrower's failure to pay charges for labor or materials or incurred other charges or judgments that could and did create Liens on a portion of the Property.

123.     As of the date hereof, Guarantor is liable to Plaintiff under the Guaranty for the maximum amount due and owing under the Loan Documents, together with interest accrued thereunder, and the fees, costs, and expenses incurred by Plaintiff in protecting its rights and pursuing its remedies against Guarantor and Borrower.

## FOURTH COUNT
**(Costs and Fees)**

124.     Plaintiff re-alleges and incorporates by reference as if set forth in full herein the allegations contained in paragraphs 1 through 123 above.

125.     Section 1.8 of the Guaranty states:

> In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall immediately upon demand by Lender, pay Lender all costs and reasonable expenses (including court costs and reasonable attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder.

**Exhibit C**, at 3.

126.     Guarantor has breached the Guaranty.

127.     On March 31, 2023, Plaintiff demanded that Guarantor pay Plaintiff all costs and reasonable expenses (including court costs and reasonable attorneys' fees) incurred by Plaintiff enforcing the Guaranty or preserving its rights under the Guaranty.

128.     Guarantor has made no such payments to Plaintiff, and Plaintiff has incurred and continues to incur costs and expenses in enforcing the Guaranty and/or preserving its rights under the Guaranty.

**WHEREFORE**, Plaintiff demands judgment against Guarantor as follows:

(i)      Declaring that Guarantor is liable for the total Debt due and owing under the Loan Documents, and for the actual damages Lender suffered by Borrower's failure to maintain its status as a Special Purpose Entity;

(ii)     Ordering Guarantor to pay Plaintiff the total Debt due pursuant to the Loan Documents, and actual damages Lender suffered by Borrower's failure to maintain its status as a Special Purpose Entity;

(iii)    Ordering that Guarantor pay Plaintiff all interest, advances, other charges, attorneys' fees, and costs due pursuant to the Loan Documents;

(iv)    Ordering that Guaranty pay Plaintiff all costs and reasonable expenses (including court costs and reasonable attorneys' fees) incurred by Plaintiff in the enforcing the Guaranty or preserving its rights thereunder; and

(v)     Granting such other and further relief as the Court deems just and proper.

Dated: April 4, 2023.          Respectfully Submitted:

WELLS FARGO BANK, N.A.

By:  <u>s/ Daniel P. Mach</u>
      Daniel P. Mach (DM1475)
      BRYAN CAVE LEIGHTON PAISNER LLP
      1290 Avenue of the Americas
      New York, NY  10104
      Telephone: (212) 541-2000
      Facsimile: (212) 541-4630

**Attorneys for Wells Fargo Bank, N.A., a national banking association**